N. Ray E.B. and N. Ray I.B. case numbers are 4-14-0260, 0261, and 0262, respectively. For the appellant is Attorney Betsy Beer. Am I pronouncing your last name correctly? That's correct. All right, thank you. And for the appellee is Attorney Jim Major. All right, Ms. Beer, are you ready to proceed? Yes. You may. Thank you, Mr. Clark. Last Thursday, I did file by mail delivery a proposed stipulation of facts. I had not received an order stating whether or not that was going to be allowed to be substituted or supplement the record. I think so. The motion will be taken up here with the case and an order will be entered separately from the decision itself. Okay, thank you. And you may argue, as you proceed here today, the case authority that you cite in the motion to cite additional authority. The motion to cite additional authority, I think, is Mr. Major's motion. Oh, and then I'm sorry. What is it that you? Right. My motion is a motion, my second motion to supplement the record on appeal, and it attaches a certified copy of a stipulation of facts that was signed by Josh Jones, the Assistant State's Attorney, by Judge Woolyhan, the trial judge, and by myself, stipulating, providing more details about the timing of the proceedings. All right. Well, I don't want you to lose any more of your time here. We don't have that motion here in front of us, but it will be ruled on here in due course and allowed. We just don't have it. May I have copies? I would love one. Thank you. We'll share. Just one copy. We'll pass it down. For me, presenting the facts was difficult because there's a void there. Something didn't happen, and sorting that out was difficult for me. The issue, though, is, in my mind, clear and simple. This was an adjudicatory hearing where my client, Tara Bullock, was confronted with a situation where she was going to lose or might lose and actually did lose the custody, care, and control of her children. Clearly, this is a fundamental liberty interest. It's well established. It's been called one of the oldest fundamental liberty interests that we have, the relationship between a parent and a child. One of the most important events in Tara Bullock's life, one of the most important events in her children's life, one of the most important events in Tara Bullock's life as a parent. Under the Juvenile Court Act and the United States Constitution, Ms. Bullock had a right to be present at this very important proceeding in the lives of her children. Under the Juvenile Court Act, the right to be present, to be heard, to present evidence, and to cross-examine witnesses are listed as independent rights. They're not interdependent. The right to be present is not dependent on whether or not Mrs. Bullock is going to present evidence or cross-examine witnesses. She has a right to be present. Under the United States Constitution, she also has a right to be present. Granted, that right is not an absolute right, and as presented in both parties' brief, we're referring to the Matthews versus Eldridge factors, criteria that are balanced, but we look first to that private interest affected, and here, obviously, the very important right of a parent. And I think not only a right of a parent to the custody and care of her children, but the right of a parent to be present when something important happens in that child's life. The second factor is the risk of an erroneous deprivation of that interest through the procedures used, and, and there's a second part to that second factor, and the probable value of additional or substitute procedural safeguards, and all we were asking here was for the court to wait. We had set an adjudicatory hearing on February 26th. If recollection serves, it was scheduled to be an all-day hearing. As the stipulation of facts show, there was a very significant and serious snowstorm the night before into the early morning hours, and Ms. Bullock, who was in the Department of Corrections in Lincoln, Illinois, was delayed in her arrival. She was in custody. She came to court. She was in shackles. She was in handcuffs. She was accompanied by two transport officers. They left Logan Correctional Center at 636 in the morning. As the attachments will show, they were to be at the Adams County Courthouse by 9 o'clock, and they were not. As the stipulation shows, the assistant state's attorney called Logan Correctional Center to find out some information about, you know, where they might be, what their estimated time of arrival was, and apparently they don't have communication when they're on the road because they didn't have that information, could not provide it. But they were able to establish for you all that they had left. Yes. It was not a situation where they forgot about the hearing or some miscommunication. She was not on the way. You were able to confirm at that time that she was on the way. Mr. Jones confirmed that and relayed that to me, and then I relayed that to the court. At what point of the proceedings did you relay that to the court? In the very beginning when the court announced the case and then I objected to proceeding at that time, telling the court that I expected Mrs. Bullock to arrive very shortly with the understandable delay as a result of the terrible road conditions. I will tell the court that I am proud to say that in Adams County, the way we operate, if any of those attorneys was an hour late to court because of snow the night before, we would have delayed because of courtesy towards one another. We take that seriously. It's important to us. It's also important we take seriously the right to counsel. And so if it had been any of us, there would have been a delay. We would have waited patiently. Counsel, not only did the adjudicatory hearing take place, but the dispositional hearing took place immediately following that. Is that correct? That's correct. We're not having any issues with that. It was clearly bifurcated hearings. I guess my point is there's an opportunity for a parent to maybe offer alternatives to placement with DCFS at a dispositional hearing in terms of the care of the children in the near future. And your client would have been deprived of that as well, correct? That is correct, Your Honor. And I certainly didn't think of that, but that's absolutely. She was not allowed to participate in either of the proceedings. Our main complaint is that she was not able to participate in the adjudicatory or to be present at the adjudicatory hearing, and then it would follow that if she prevails here, that the adjudicatory would be remanded for an adjudicatory hearing and then followed by a dispositional hearing. Counsel, in looking over this matter, I must admit that I was very troubled by the timeline when I considered the requirements of the Juvenile Court Act as to when an adjudicatory hearing is supposed to take place, when a dispositional hearing is supposed to take place. Yes. And it was just rather astounding to me that these kids came into care March of 2014 and were not having an adjudicatory hearing until February. March 6 to February 26. Of 2015, 2015. Correct. And there were a number of continuances. Editorializing the Juvenile Court is supposed to be one of the most important courts in our system. It frequently, though, is the red-headed stepchild. And so when other matters are called and other attorneys have to be in a criminal case, which is what happened here, but Jansen was Mrs. Bullock's first attorney and he wasn't available for a couple of appearances early on in the case. You're talking ten continuances, if I'm recalling correctly. I numbered ten continuances. In the beginning, a matter of organizing the case and getting everybody with their discovery and being able to present the case. But then the continuance started with Mr. Jansen having to be in trial. Then we had the summer and then witnesses aren't available and so there's one continuance after another. And then the State's Attorney's Office hired Mr. Jansen and so he could no longer obviously be. He had to withdraw and then I was appointed and in order for me to become acquainted with the case, we had some other delays. And so we were, yes, we had ten continuances in that. Did the trial court indicate either on the record or off the record why it was that the matter would proceed in the manner that it did as opposed to waiting until your client arrived? On the record, the court said that it was in the children's best interest to no longer delay. This was a situation where the father, Mr. Bullock, had advised counsel that he was going to admit the petition and that would resolve the case. And then the attorneys could go on with the rest of their days and that's what happened. So this was a 9 o'clock hearing? It was a 9 o'clock hearing. So she was 36 minutes late? Well, I imagine that she arrived at the front door. By the time she gets out of the van over the snow, she wasn't in the courtroom until the case was over. Everybody had dispersed. They moved faster than I did and I was still there. So you hadn't had time to leave yet? I had not left. You had time, but you didn't want to move that quickly. Well, I just don't. It was just fortuity that I was there when she showed up. When we talk about those Matthew V. Eldridge factors, one of them is the state's interest in the proceedings, but also adding to that the cost of the additional procedures. And I think that this, too, is something that's kind of galling because the Department of Corrections went to the cost and a little bit of risk to produce Mrs. Bullock. There was a burden on the state that was incurred, and the way this proceeding transpired, that was not honored. It was wasted. It was not effective or good use of the state's time.